### In re KELLY'S CHOCOLATES, INC., Debtor.

William E. Lawson, Trustee, Plaintiff,

v.

Corrao Family LLC, Ernest Corrao and Mary Jo Corrao, T. Luanne Pisani, Thomas J. Corrao, David Berger and Michele Berger, Defendants.

Bankruptcy No. 97–15094 K.
Adversary Nos. 99–1032 K to 99–1036 K.

United States Bankruptcy Court, W.D. New York.

Sept. 28, 2001.

---

**346**

William E. Lawson, Buffalo, NY, trustee.

Daniel F. Brown, Damon & Morey, Buffalo, NY, for defendants.

MICHAEL J. KAPLAN, Bankruptcy Judge.

The "ordinary course of business" defense (11 U.S.C. § 547(c)(2)) that defeats a trustee's effort to avoid a preferential transfer under 11 U.S.C. § 547 usually involves multiple transactions between a debtor and a supplier of goods or services on credit to debtor. Typically one encounters a number of purchase orders issuing from a debtor to a trade supplier, a succession of goods or services delivered on credit by the trade supplier, and a succession of payments made by the debtor. If the debtor paid for these goods or services within the usual time for doing so as between the debtor and the trade supplier, and if that "usual" time is also typical in the industry, then the "ordinary course of business" defense would prevail even if the billing invoices called for prompter payment. If all these facts are known to a trustee, the trustee would not even commence suit in the face of such a defense. But if the payments were later than usual or would be viewed as extraordinary in the relevant industry, then payments made within 90 days before bankruptcy while insolvent would be recovered to benefit all creditors, with a pro-rata share to the defendant/transferee.

This pattern is so customary that any significant departure from it might end up before the United States Supreme Court, as occurred in *Union Bank v. Wolas (In re Wolas)*, 502 U.S. 151, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991). The High Court there held that an "ordinary course of business" defense could be discerned within the context of a single long-term installment loan transaction. Making installment payments on a single loan can establish an "ordinary course of business or financial affairs" for purposes of the § 547(c)(2) defense.

The several Adversary Proceedings currently before this Court are consolidated for purposes of this decision only. The facts are not in dispute, and the cross motions for summary judgment present a single dispositive question. The Defendants would like that question to be one

which, like *Wolas*, would present a new "twist" on the "ordinary course" defense, if successful. The "twist" they would like to present asks the Court to assume arguendo that a given debtor (here a candy maker whose main business was production for the Christmas, Valentine and Easter seasons) has a business cycle that necessitates annual short term loans, and that someone who provides one or two of those loans can establish the "ordinary course" defense even though such a lender has never made business loans to anyone before and might never do so again. It is argued that there needs to be "a first time for anything," and that if one is a first-time lender in what is the ordinary borrowing cycle for such a debtor, it would not be appropriate for the outcome to rest on whether the defendant was experienced in making these loans or, instead, was making that kind of loan for the first time.

As interesting a question as that argument presents, this Court declines the invitation to address it. The undisputed facts are too far removed from the hypothetical.

The Court is willing to assume arguendo that the Debtor here needed a short term loan each autumn when entering into the manufacturing cycle for its seasonal products, and that its business cycle in the pre-bankruptcy past had always permitted it to repay those loans each March. The Court is also willing to assume arguendo that in the fall of 1996 (the fall preceding the August, 1997 filing of this involuntary Chapter 7 case), the Debtor could have obtained its annual short term borrowing from a commercial lender, at a 25% interest rate. If the Debtor had found a single, "novice," arms-length lender willing to loan at that rate or less, then the hypothetical argued by counsel might be presented.

But what actually happened in this case is that the Debtor sought a quarter million dollar loan from a quasi-public development authority. That authority decided that the Debtor needed a half million dollars in working capital rather than a quarter million dollars in working capital, and it promised to loan the Debtor a quarter million dollars only if the Debtor could obtain a loan from someone else for the other quarter million dollars. It seems that any such additional debt was required to be subordinated to the agency loan. The Defendants have made an offer of proof that the Debtor could have obtained that other quarter million subordinated dollar loan from a commercial lender at 25% interest; the Court will assume this to be true for the sake of argument only. Rather than borrowing the quarter million dollars from the commercial lender, the Debtor borrowed it from "insiders." 11 U.S.C. § 101(31). The Debtor's principal, various of the principal's family members, and a family-owned limited-liability corporation [1] each made one or more loans or "advances" to the Debtor, in varying amounts, but all of these were payable on the same date in March 1997, a few months later. These are referred to by the Defendants as "grid loans." To the Court, however, these were mere promissory notes because even if more than one "advance" was made by one of the insiders, the dates due did not vary at all; "grid loans" connote (to this writer) multiple loans and satisfactions thereof using a single instrument plus a "grid" on which to record each advance and the satisfaction thereof. Multiplicity is, thus, a feature of "grid loans," and multiplicity presupposes a "course" of dealing. Use of the term seems to presume the answer to the ques-

---

1. The record does not disclose whether this was an already-existing L.L.C., or whether it was formed for this specific purpose.

tion before the Court, and the Court will not accept the Defendants' usage of the term here.

Obviously, each of the lenders knew that the others were lending and knew the purpose and the aggregate amount of the loans. They all surely knew that this lending was necessary to permit the Debtor to borrow $250,000 more from the development authority. Even if short-term borrowing by the Debtor and by others in the industry was "ordinary" and even if the insiders wished to become regular lenders, there is nothing "ordinary" about what the insider lenders did here. By no means may one equate their collective action with the hypothetical "first time" commercial lender that is the focus of the novel argument advanced here. Again, after the Debtor went to the development agency seeking a quarter million dollars and received the response it received, it went to a number of commercial lenders who said that they would lend the other $250,000 at 25%. Had one insider of the Debtor then agreed to loan the quarter million dollars at 25% or less and leave out the agency altogether, even though she or he had never loaned any significant sum to anyone before or since, then the hypothetical might well then be before the Court, and the Court would rule upon it one way or the other. (The Court declines to suggest how it might rule.) [2]

Instead, the Debtor thought it needed only a quarter of a million dollars. The development agency disagreed. But it should have required the extra quarter million to be raised by the Debtor as *equity*, not as debt. (That would have better served all of the Debtor's creditors, as it turns out with benefit of hindsight.) Told by its prospective lender that the Debtor needs to borrow twice as much as the Debtor thought it needed, the Debtor and its insiders certainly felt that borrowing a second quarter million dollars from family members was safe for them, because the Debtor didn't need that second quarter million dollars anyway and would be able to promptly pay all the lenders back.

So it seems clear that the family members agreed to individual arrangements which, collectively, were somewhat akin to "participations" in a single loan for which the Debtor had no genuine need, in the Debtor's view.

Just as the family expected, these were promptly paid back. In fact, they were paid back several weeks before the due date. But what no one ever told the participants, perhaps, was that lenders who are "insiders" suffer an enormous burden that lenders who are not "insiders" do not suffer. That is the one-year (rather than 90–day) "look back" period for preferential transfers.

The insiders were paid in March, 1997 and the involuntary petition was filed about 180 days later. Even if it were *stipulated* that these transactions and the payments thereon were extraordinary, they would have been *non*-avoidable if they did not occur among "insiders," because they were made prior to the ninety-day preference period.

Interesting, but not material to this decision, is the fact that the development authority eventually suffered a loss. The Debtor claims to have had verbal permission from the development authority to repay the family loans before repaying the development authority because the Debtor was supposedly negotiating for a new or rollover loan at the time. The Debtor eventually repaid the development authority but that was within what became the

---

**2.** The hypothetical might also be presented if a non-insider, novice extended the subordi-

nated loan that enabled borrowing from the agency.

ninety-day preference period.[3] The authority had to disgorge a compromised amount to the bankruptcy estate. (The compromise lay in uncertainty regarding proof of insolvency.)

In sum, this is not the proper case to address the interesting hypothetical posed by the Defendants through counsel. What the Defendants did here was no more "ordinary" a "loan transaction" than an L.B.O. is as an acquisition transaction. In an L.B.O. the buyers of the company cause the company to bear the purchase price as debt. Here the insiders could simply have loaned the Debtor the $250,000 it needed. Instead, they loaned it $250,000 solely to enable it to qualify for a second $250,000, and then they took their $250,000 back, with interest.

When that is a guileless result achieved by a lender who does not control the Debtor, the lender might be safe, 90 days later. When that is achieved by an "insider" less than 1 year before the bankruptcy, guileless or not, the purpose of the preference statute—equality of distribution—is brought to bear in favor of those creditors who are not relatives of the Debtor's principal officer-owner-director.

3. As noted above, this was an involuntary filing. Consequently, there should be no inference that the Debtor had any knowledge that the authority might be at risk to disgorge or that the Debtor planned the timing of the filing.